JACK M. OSBORN V. STATE.

No. 26,612. November 25, 1953.
Appellant's Motion for Rehearing Denied
(Without Written Opinion) January 20, 1954.

*Theo Ash,* Abilene, for appellant.

*Wesley Dice,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

Appellant was convicted in the district court of Taylor County of the offense of murder with malice and his punishment assessed at confinement in the state penitentiary for a term of 15 years.

The facts in this case are somewhat conflicting. However, as viewed from the state testimony, we find the following:

Curtis Couch, the deceased, was a blind man. On January 17, 1953, he was present in the home of the appellant where appellant seemed to have been living by himself. There was considerable drinking during the day, and the appellant's testimony is somewhat confusing as to just what actually occurred therein. This much is proven: That appellant himself called the police department of Abilene and stated: "Curtis Couch was choking my girl. I made him quit. He made a run at me and I shot him." He requested the officers to come to his house immediately. Two members of the police department went at once to the appellant's house. In an attempt to enter the door, they found the body of a person lying inside of the room against the door. They were directed to go around and enter by another door. They went in and found present a woman by the name of Carrie Bynum. The deceased had been shot in the chest with a .22 caliber rifle. The bullet penetrated his heart and he died immediately thereafter. Appellant also told the officers that he had called his father and told him that he had just shot a man and that he used only one shell. He also told the officers that the gun was in the bed room and insisted that they take the same.

Appellant and his girl companion were taken to the police headquarters, and after interrogation, appellant signed a voluntary confession wherein he stated that the deceased was at his house and had hit him with a wine bottle; that he started to choke Carrie Bynum; that appellant went and got his gun; that the shot which was fired hit the deceased who fell at the foot of the bed where Carrie Bynum was.

After the case had proceeded for quite some length of time the state introduced in evidence a further portion of the appellant's confession wherein he stated that the deceased and Roy Raines had a tussle over the gun and the shot was fired; that thereafter Roy Raines left by the back door. The state's evidence consisted mainly of the appellant's confession and other statements made by him to the officers and to his father in the presence of the officers that he (appellant) had shot the deceased. There were also introduced numerous witnesses for the state and the defendant, most of whom attacked the appellant's reputation as a peaceable, law-abiding citizen, and some attacked the reputation of the deceased as being a violent and dangerous character.

The testimony of the appellant shows that he was at home since noon on the day of the homicide; that he was drinking wine and whisky; that he and the deceased had a fight of some kind during which the deceased struck him with a wine bottle and was choking the girl; that appellant went to bathroom to wash the blood from his face; that Roy Raines, an ex-convict, was present and appellant asked him (Raines) to stop the deceased from abusing the girl; that Raines came to the bed-room and got a gun; and appellant grabbed the gun and two shots were accidentally fired therefrom.

The witness Roy Raines testified that he was present in the home of the appellant; that a quarrel ensued between the deceased and the girl; that he left and was not present when any of the shots were fired and did not hear them; that he was not there when the deceased was killed.

From the state's standpoint, however, it was shown that the appellant and this girl were at his home all day of the homicide and were drinking wine and whisky; that a quarrel ensued between the deceased and the girl during which the appellant shot the deceased in the chest from which wound he soon died.

There is no testimony in the record relative to the theory of

self-defense, either from the appellant or the girl, nor that appellant believed at the time he shot that his own or the girl's life was in danger, nor that the girl was in danger of suffering any serious bodily injury at the hands of the deceased. Outside of the confession of the appellant, there is testimony that appellant stated that he was the one who shot the deceased.

There are four formal bills of exception which we will attempt to discuss. The first two bills (Nos. 1 and 2) question the sufficiency of the evidence to support a verdict of guilty of murder with malice. Appellant filed a motion for an instructed verdict on the ground of the insufficiency of the evidence, particularly on the alleged ground that the evidence relied upon by the state to establish the fact that appellant shot and killed the deceased was evidence of an exculpatory nature and that the state was thereby bound by such exculpatory statement.

Bill of Exception No. 2 reflects that at the conclusion of the testimony appellant filed a motion for an instructed verdict on the alleged ground that the state had wholly failed to establish by legal and competent evidence that appellant was guilty of murder for the reason that there was introduced and relied upon an exculpatory statement made by the appellant as follows:

"He (deceased) was choking my girl. I made him stop and he ran at me."

This being the portion of the confession introduced by the state, it is the appellant's contention that the state is bound thereby since it failed to disprove the truth thereof.

From the brief of our state's attorney we take the following excerpt:

"Appellee urges that that portion of the confession wherein appellant stated that the deceased was choking his girl and that appellant made him stop and that the deceased ran at him were not of such exculpatory nature as to present an absolute self-defense on the part of appellant. The exculpatory statements do not show that appellant shot the deceased through fear of death or serious bodily injury of himself or his girl companion. The trial court properly charged the jury that the State was bound by the exculpatory statements and had the burden of disproving the same. Even though the exculpatory statements which raised the issue of self-defense were binding upon the State, it is thought that they were not of such a nature as to make a complete self-defense within themselves in behalf of the appellant."

It was shown by the testimony of Roy Raines that he was not present when the deceased was shot; that he was not tussling with anybody relative to the gun; that he did not have hold of the gun; that he did not hear any shot of any kind from the gun; and that he left at a time prior thereto.

It seems to us that the exculpatory statement relative to an accidental killing was disproved by the statement of the appellant himself to the officers, as well as to his father, that he had shot the deceased because he was choking his girl.

We think further that the appellant's confession relative to self-defense was totally destroyed by his own testimony that he did not shoot the deceased, or that if he did shoot the deceased, he shot him by accident.

Bill of Exception No. 3 relates to the appellant's objection to the introduction in evidence by the state of two pictures (State's Exhibits Nos. 2 and 3) which were pictures made of the room in which the deceased was shot. The only objection thereto was the presence of a hat lying on the floor near the door, appellant contending that the presence of the hat was an inference that the deceased was wearing a hat and was trying to leave when he was shot. The witness who took these pictures, as well as others, testified that the pictures presented a good likeness of the room when the same were taken a short time after the deceased had been shot. The proof does show that two state's witnesses, when they arrived at this house, were not able to get into the door in the front of the house because of a body which was lying just inside of the door; that on that body there was a hat. They entered the house from another door and found this body lying against this door with a hat on the head. Soon thereafter there was supposedly detected a small pulse beat in the body when it was immediately taken to the hospital, but life was gone therefrom when the hospital was reached. Upon returning to the room they found it in the same condition as when they found the body except that the body had been taken away. We see no error in the admission of these photographs. See Hassell v. State, 80 Tex. Cr. R. 93, 188 S.W. 991; Watson v. State, 84 Tex. Cr. R. 115, 205 S.W. 662; Hart v. State, 87 Tex. Cr R. 55, 219 S.W. 821.

Appellant's Bill of Exception No. 4 complains of the action of the trial court in refusing to declare a mistrial because of certain questions propounded by the district attorney to the

witness, M. L. Kennedy. These questions that were propounded to such witness were objected to by the appellant and the court sustained the objection and instructed the jury not to consider the questions for any purpose. The court also instructed the district attorney not to go into the matter further. There was no answer given to any of the questions complained of. Usually the asking of improper questions by the prosecution is cured by the sustaining of the objection and instructing the jury to disregard the same. See Tabb v. State, 154 Tex. Cr. R. 613, 229 S.W. (2d) 628; Sanders v. State, 132 Tex. Cr. R. 466, 104 S.W. (2d) 864; Kuhn v. State, 142 Tex. Cr. R. 40, 151 S.W. (2d) 208; Wallace v. State, 145 Tex. Cr. R. 625, 170 S.W. (2d) 762

Under the facts herein presented and the court's instructions, we think that this cause was properly tried, and see no evidence of any error therein.

The judgment will therefore be affirmed.